<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **Magistrate No. 05-5017 (TJB)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **LUCAS M. SCHLOMING** | **:** | **LETTER OPINION AND ORDER** |

**<u>BONGIOVANNI, Magistrate Judge</u>**

This matter comes before the Court upon Motion by Assistant United States Attorney Eric Schweiker, Esq., for the United States Attorney's Office [hereinafter "the Government"] seeking to have this Court order the Bureau of Prisons [hereinafter "the BOP"] to administer psychotropic medications to Defendant Lucas M. Schloming [hereinafter "the Defendant"] against his will to restore competency so that this matter can proceed to trial.

***Procedural History***

On May 7, 2005 the Defendant was charged in a three-count Criminal Complaint consisting of two counts of interstate stalking in violation of 18 U.S.C. § 2261A and one count of sending threatening communication in interstate commerce in violation of 18 U.S.C. § 875(c). (*See Criminal Docket Report, Docket Entry #1*).  That same day, May 7, 2005, the Defendant was arrested.  (*Criminal Docket Report, first entry*).

The Complaint alleges that the United States Secret Service began investigating the Defendant after receiving information from the Princeton University Department of Public Safety that threatening e-mails were being received by a Princeton University student from the Defendant.  On April 30, 2005, law enforcement officers in Massachusetts interviewed the

Defendant and instructed him to stop communicating with the student.  (*Criminal Complaint*).
At that time, the Defendant agreed to cease communications, however, on May 5, 2005 the
Defendant boarded a plane and traveled from Massachusetts to New Jersey.  (*Id*.).  The
Defendant spent the night of May 5, 2005 at a motel near the Princeton University campus.  (*Id*.).
Thereafter, the Defendant was located on the campus of Princeton University inquiring as to the
location of the student.  (*Id*.).  He was then arrested.  (*Id*.).  Inquiries as to his intentions were
made by law enforcement, but the Defendant failed to adequately respond.  (*Id*.).

An Initial Appearance was held before this Court on May 9, 2005.  The Office of the
Federal Public Defender, Brian P. Reilly, Esq. appearing, was appointed to represent the
Defendant.  (*Criminal Docket Report, Docket Entry #3*).  This Court determined, pursuant to
Title 18 U.S.C. § 4241(a), that a full psychiatric evaluation by qualified BOP personnel was
necessary to determine whether the Defendant was competent to stand trial and assist in his own
defense.  (*Criminal Docket Report, Docket Entry #2*).  The Defendant was detained pending a
competency hearing.  The Defendant was transported to the Federal Medical Center Devens,
Massachusetts for the competency evaluation.  A report was issued on July 28, 2005.  A
competency hearing was held on August 5, 2005, at which time this Court determined that the
Defendant suffered from a mental disease rendering him mentally incompetent to the extent that
he was unable to understand the nature and consequences of the proceedings or to assist properly
in his own defense.  Pursuant to Title 18, U.S.C. § 4241(d), the Defendant was ordered to remain
in the custody of the United States Attorney General and placed in a suitable facility to determine
whether there was a substantial probability that in the foreseeable future the Defendant would
attain the capacity to permit the trial to proceed.  (*Criminal Docket Report, Docket Entry #'s 8,9*).

The Defendant was transferred to the Federal Medical Center Butner, North Carolina for the evaluation.

A report by Dr. Jill R. Grant, Staff Psychologist and Dr. Bruce R. Berger, Staff Psychiatrist, both assigned to the Defendant's case and both practicing at the Federal Medical Center Butner, was issued on October 26, 2005. (*See Forensic Report, Federal Medical Center Butner*). The report ultimately concluded that the Defendant was suffering from Schizophrenia, Undifferentiated Type and was not competent to stand trial or aid in his defense. (*Id.* at 7, 8). The report further indicated that the Defendant was refusing to take the recommended medications and advocated that the Defendant be involuntarily medicated. (*Id.* at 5-8).

After the dissemination of the Federal Medical Center Butner Forensic Evaluation Report to the appropriate parties, the Government filed the instant Motion to Involuntarily Medicate the Defendant. Letter briefs were provided to the Court by the Government and the Defendant, and a hearing was subsequently conducted on April 11, 2006 during which testimony by Dr. Jill R. Grant and Dr. Bruce R. Berger was heard. (*Criminal Docket Report, Docket Entry #13*). The Defendant remains in the custody of the United States Attorney General at the Federal Medical Center Butner, North Carolina. (*Id.*).

***Defendant History***

The Defendant is a 31 year old Caucasian male who, along with his twin brother and a younger brother, was raised in rural Maine by his parents. (*See Forensic Report, Federal Medical Center Devens, p. 2*). The state of the Defendant's childhood remains questionable as the Defendant himself reports suffering from verbal abuse by his mother with random acts of physical "discipline" by his father, but these reports may be exaggerated or manufactured by the

-3-

Defendant due to an underlying paranoia the Defendant has consistently displayed throughout his medical history regarding his family.  (*Id*.).

A history of mental illness appears to exist within the Schloming family.  Specifically, medical reports reflect that the Defendant's twin brother has been diagnosed with Bipolar Disorder.  (*Id.*).  The Defendant's mother and maternal grandfather have also been described as having possible manic symptoms.  (*Id.*).

The Defendant presented as an active member of the community up to and through his first mental episode.  He displayed a superior level of intelligence academically, earning high marks and a bachelor's degree from MIT in 1999.  (*Id*. at 3).  In his sophomore year of college, he suffered a psychotic break.  (*Id*.).  The Defendant was placed on medication and after receiving his degree, accepted employment with the Federal Reserve in Washington, D.C.  (*Id*.).  At some point during the course of his employment, the Defendant ceased taking his medication, leading to behavior which resulted in his termination in April, 2000.  (*Id*.).  The Defendant has not held a job for any significant length of time since April of 2000, and has been residing with his parents.  (*Id*.).  The Defendant has never married, never fathered any children, and never previously been criminally convicted.  (*Id*.).  The Cambridge Police Department, however, had been called on numerous occasions to transport the Defendant to psychiatric hospitals when he became physically or verbally aggressive.  (*Id*.).

The Defendant's treatment for mental illness began in 1994.  (*Id.* at 4).  More than twelve psychiatric hospitalizations have occurred since 1994, usually following a period of time during which the Defendant would stop taking prescribed medications for his mental illness.  (*Id.*).  Several different diagnoses have been made by different doctors since treatment first began,

-4-

including Psychotic Disorder Not Otherwise Specified, Bipolar Disorder and Schizoaffective

Disorder.  (*Id.*).  However, the most recent treatment providers, including doctors at FMC

Devons and FMC Butner, all concur that the Defendant is suffering from Schizophrenia,

Undifferentiated Type.  (*See* Forensic Report, Federal Medical Center Devens, p. 7; Forensic

Evaluation, Federal Medical Center Butner, p. 7).

***The Issue***

        To date, the Defendant has been unable to actively participate in any criminal proceedings

due to his mental illness.  Upon admission to FMC Butner, he was prescribed two separate

antipsychotic medications, Quetiapine and Klonopin.  (*See* Forensic Report, Federal Medical

Center Butner, p. 5).  The Defendant, after initially consenting to the medication, became

noncompliant and the medication was discontinued.  (*Id.*).  It is the consensus of the medical

team at FMC Butner that the Defendant does not believe that he has a mental illness and

therefore cannot understand or accept that he needs antipsychotic medications to assist in his

recovery.  (*Id.* at 6).  Additionally, the medical team does not believe that the Defendant is

overtly threatening to himself or others, nor that the Defendant is gravely ill, and as such, does

not meet the criteria for involuntary treatment pursuant to *Washington v. Harper*, 494 U.S. 210

(1998) (*Id.* at 8). It is, however, the consensus of the medical team that therapy alone, without the

aid of medication, will not successfully render the Defendant competent, that no other methods

of treatment exist to assist the Defendant, that without the aid of antipsychotic medication, the

Defendant will not obtain a level of competency necessary to stand trial, but that with the aid of

antipsychotic medication, he would "likely" obtain a level of competency sufficient to stand trial.

(*Id*. at 8, 9).[1]   The Government contends that involuntarily medicating the Defendant to render him competent is appropriate under the circumstances and in consideration of the criteria prescribed by the Supreme Court in *Sell v. United States*, 539 U.S. 166 (2003).  The Government believes that the circumstances are such as to satisfy *Sell*, thus necessitating the involuntary administration of antipsychotic medication upon the Defendant.  The Defendant, through his attorney, argues that the *Sell* factors have not been satisfied, and that the Defendant's privacy rights outweigh the minimal governmental interest in bringing the Defendant to justice.

In *Sell*, the Supreme Court held that a court may order the involuntarily medication of a mentally ill Defendant to render him competent for trial if: (1) there are important governmental interests in trying the individual; (2) the treatment will significantly further those interests; (3) the treatment is necessary to further those interests, considering any less intrusive alternatives; and (4) the treatment is medically appropriate.  (*Id*. at 180-181).  The relevant findings must be supported by clear and convincing evidence, the burden of which is to be carried by the Government.  (*United States v. Gomez*, 387 F.3d 157, 160 (2d Cir. 2004)) (*United States v.*

---

[1]   The Supreme Court has outlined different tests for when a court may order involuntary medication of a Defendant.  The tests are predicated upon whether the medication is recommended due to an individual's dangerousness to himself or others or is in his best medical interests due to grave illness (*Washington v. Harper*, 494 U.S. 210 (1998)) (holding that involuntary medication of an inmate with a serious mental illness is constitutionally appropriate where the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest), or, whether the purpose of the involuntary medication is to prosecute an incompetent Defendant (*Sell v. United States*, 539 U.S. 166 (2003)).  The Supreme Court in *Sell* cautioned that a court does not have to consider whether to allow forced medication for the purpose of rendering the Defendant competent to stand trial if the forced medication is warranted for other purposes such as those articulated in *Harper*.  Here, the Defendant's medical team found that the Defendant is not a danger to himself or others, or that his life would be threatened if antipsychotic medication was not administered.  The parties do not appear to contest these findings.  This Court must therefore consider whether the involuntary medication proposed here is constitutional under the *Sell* framework, and Its discussion shall be so limited.

-6-

*Bradley*, 417 F.3d 1107, 1114 (10th Cir. 2005)).

The *Sell* criteria, taken as a whole, must outweigh a Defendant's significant interest in avoiding the unwanted administration of antipsychotic drugs.  As the Supreme Court has recognized, "[t]he liberty of citizens to resist the administration of mind altering drugs arises from our Nation's most basic values." (*Washington v. Harper*, 494 U.S. 210, 1045 (1998)) (concurring opinion).  Additional rights implicated include privacy interests under the Fifth and Fourteenth Amendments, free expression under the First Amendment and a fair trial under the Sixth Amendment.  (*Id.* at 221, 230 (1998)) (*Riggins v. Nevada*, 504 U.S. 127, 143 (1993)).  Given that  "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty," (*Harper* at 231), that substantial interference can only be imposed if the governmental interests are essential and overriding.  (*Sell v. United States*, 539 U.S. 166, 178 (2003)).

This Court must therefore consider the *Sell* criteria and determine whether the Defendant's rights can be overcome by the Government's interests in prosecution.  Each of the *Sell* criteria must be met in order to show that the Government's interests are overriding.  If not, the Defendant's rights remain paramount, and the Government's Motion must be denied.

***Analysis of Sell Factors***

        I.     <u>Whether Important Governmental Interests are at Stake</u>

*Sell* first requires that the court consider whether "important governmental interests are at stake" in the Defendant's prosecution.  (*Id*. at 180).  *Sell* indicates that "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important" if the Defendant is both charged with a "serious crime" and "special circumstances" do not undermine the

Government's interest in trying him for that crime.  (*Id*.).

A.      Seriousness of the Offense

*Sell* does not, however, elaborate on what constitutes a serious offense.  Since *Sell's* publication, only a few courts have had occasion to consider the definition of "seriousness" in this context.  Although no firm definition has evolved, crimes such as felon in possession of a firearm (*United States v. Gomes*, 387 F.3d 157, 161 (2nd Cir. 2004)), armed bank robbery (*United States v. Morris*, 2005 WL 348306 (D.Del. 2005)), attempted murder (*Sell v. United States*, 539 U.S. 166 (2003)) and threatening to murder a federal judge (*United States v. Evans*, 404 F.3d 227 (4th Cir. 2005)) have been found by courts to constitute a serious offense.  In contrast, in *United States v. Dumeny,* 295 F. Supp. 2d 131, 133 (D. Me. 2004), the court held that where the charge was  possession of a firearm by a person previously committed to a mental health institute, "the government interest at stake [was] insufficient to mandate the intrusive involuntary treatment of [the Defendant].  And in *Evans*, the Fourth Circuit seems to suggest that the misdemeanor charge of assaulting, resisting or impeding an agricultural official with which the defendant was originally charged may not be of sufficient seriousness alone to implicate an important government interest.  (*Evans* at 238).

The courts that have addressed this issue provide little insight into their determination.  The *Evans* decision contains the most detailed analysis.  Noting that *Sell* offered no guidance on how to determine the seriousness of an offense, the Fourth Circuit looked to Supreme Court decisions addressing seriousness in the context of right-to-jury cases and determined that "it is appropriate to focus on the maximum penalty authorized by statute in determining if a crime is 'serious' for involuntary medication purposes."  (*Id.* at 237).  The Fourth Circuit held that the

-8-

maximum penalty authorized by statute should govern rather than sentencing guideline ranges since "there is no way [at this stage of the proceedings] of accurately predicting what that range will be." (*Id*. at 238).   The court, however, rejected the idea of setting forth any "rigid rule" regarding what statutory maximum meets the "seriousness" threshold, and stated only that a felony carrying a maximum punishment of ten years imprisonment (the penalty defendant Evans faced at the time) should be considered serious.

With little guidance, this Court must determine where on the seriousness spectrum this charge falls.

### B.   Special Circumstances

Even if it were determined that the Government's interests in bringing an individual accused of a serious crime to trial were important, the inquiry does not end.   "[C]ourts must consider each case's facts in evaluating this interest because special circumstances may lessen its importance..." (*Sell* at 181).   Two examples of special circumstances provided by the Supreme Court are directly relevant.   The first is where a Defendant who fails to take medication voluntarily faces lengthy confinement in an institution which would "diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." (*Id*. at 180-81).   The second is where a Defendant has "already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed . . .)." (*Id.)*.

The Fourth Circuit's determination in *Evans* that the statutory maximum is instructive rather than the potential sentence pursuant to the sentencing guidelines appears in conflict with the Supreme Court's analysis in *Sell* which permits the court to consider the amount of time already served toward a sentence which would be "ultimately imposed."   While the Fourth

Circuit is correct that the ultimate penalty is impossible to determine at such an early stage of prosecution, absent any aggravating factors not currently known, it is rare that a maximum statutory penalty is imposed upon any particular Defendant.  Although no longer binding, sentencing courts continue to utilize the United States Sentencing Guidelines when fashioning an appropriate sentence.  In order to accurately assess whether special circumstances exist, this Court finds that both the statutory maximum penalty as well as the projected sentencing guideline range must therefore be considered.

In the case at bar, the Defendant faces a statutory maximum of five years for each of the three counts alleged in the Criminal Complaint.  The parties agree that the sentencing guidelines contemplate a penalty of 18-24 months.  (April 11, 2006 *Sell* hearing).  This Court therefore finds that utilizing the guidelines to determine the sentence the Defendant would most likely face to ascertain whether special circumstances exist most assiduously complies with the holdings of *Sell*, and the penalty of 18-24 months will provide the basis of Its analysis when addressing the special circumstance of time already served verses time ultimately imposed.

      C.    Determination

This Court agrees with the Supreme Court which noted that the circumstances which will permit forced medication solely for trial competence purposes  may be rare.  The Supreme Court also emphasized that "a court must find that *important* governmental interests are at stake."  (*Sell* at 167).  Nearly every felony can be described as "serious."  Had it been the Supreme Courts' intention to classify a charge as serious based on the maximum penalty, it could have done so.  It is, therefore, this Courts determination that something more than the maximum penalty must be considered.

Additionally, the seriousness of the offense cannot be based on what might have been. It must be contemplated within the context of what was. It is impossible to know what the Defendant's intent was at the time he went to see the victim. The charges alleged, specifically, interstate stalking and threatening communication through interstate commerce, offer little more in terms of guidance. According to the Complaint, the victim had been responding to e-mail communications from the Defendant believing that he was someone she knew. When she realized she did not know the sender and learned that the Defendant had taken affirmative steps to see her personally, she became fearful. To date no one is able to confirm whether there was anything to fear.

Without minimizing the importance of the charges or questioning the fear felt by the victim, this Court none-the-less finds that the Government's interest in bringing this Defendant to trial does not outweigh Mr. Schloming's constitutionally protected liberty interest in avoiding involuntary administration of antipsychotic drugs. (*See* Riggins v. Nevada, 504 U.S. 127, 134 (1992)). The parties agree that the penalty as contemplated by the sentencing guidelines is 18-24 months and cannot, in this Court's view, be considered a significant penalty when one considers the length of incarceration the guidelines impose for other crimes, both similar and dissimilar. For these reasons, the Court finds that the crimes allegedly committed by the Defendant do not meet the "seriousness" requirement as set forth in *Sell*.

Assuming that the crimes qualify as "serious" under the *Sell*'s criteria, the Government's interests are significantly diminished by special circumstances which exist and as contemplated in *Sell*. First, the Defendant has already been incarcerated since May 7, 2005, totaling 12 months of the 18-24 months' incarceration the Defendant faces. If this Court were to order the

-11-

involuntary medication of the Defendant, the known effects and subsequent evaluation to determine whether the Defendant gained competency could take as long as eight months (testimony of Dr. Berger, April 11, 2006 *Sell* hearing), likely resulting in the incarceration of the Defendant beyond which he may be sentenced.

Moreover, it is unlikely that the Defendant will reenter society if unmedicated.   Before the Defendant could be released, an evaluation as to whether his release would cause a substantial risk of bodily injury to another or serious damage to property would  be conducted. (*See* 18 U.S.C. § 4246).  If deemed to pose such a risk, the Defendant could face civil commitment.  Assuming he were deemed not to pose a danger and  his release were to occur, the Defendant's parents, who have obtained full guardianship, have expressed their intention to place the Defendant in a mental health institution closer to their home to help aid in his recovery. Based on the foregoing, any risks the Defendant may pose to the victim or the public in general are diminished.

This Court determines that the charges pending against the Defendant do not qualify as serious as contemplated by *Sell*.   If they were to be considered serious, special circumstances significantly undermine any governmental interests.  Therefore, the Government fails to satisfy the first prong of the *Sell* criteria.[2]

II.    Whether Treatment will Significantly Further the Government's Interests

Under the second *Sell* prong, the Court must evaluate whether forced medication is

---

[2]  Because all prongs of the *Sell* criteria must be met by the Government to warrant the Defendant's involuntary medication, it is unnecessary for the Court to continue Its analysis under *Sell*.  However, considering the weighty issue presented and the potential need to memorialize Its findings for any future evaluations the Defendant may face, this Court will complete Its analysis of the *Sell* criteria as it applies to this Defendant.

substantially likely to render the Defendant competent, and whether the medication is substantially unlikely to interfere significantly with Defendant's ability to assist counsel in his defense.

A.    Will the Medication Render the Defendant Competent

_____The question of whether the Defendant can be rendered competent cannot be answered with conviction.  Evidence provided to the Court via written and oral medical evaluations and testimony suggests that the Defendant can be helped with medication.  During those times when the Defendant was willing to take medication, albeit limited in dose and regularity, his mental health improved.  If history is any indication, antipsychotic medication significantly assisted the Defendant, to the point that he was able to graduate from MIT with straight A's.  Whether the medication can render the Defendant competent is an open question, but one in which the Defendant's current medical team answers in the affirmative.  (*See* Forensic Evaluation, Federal Medical Center Butner, p. 3).  The medical team is adamant, however, that without medication, the Defendant will never be competent to stand trial.

This Court will not presuppose that the Supreme Court in *Sell* expected that all situations of involuntary medication would be able to affirmatively answer with certainty the question of whether such medication would render a particular Defendant competent.  It is likely that the majority of these types of cases can only hypothesize with the aid of medical experts and prior medical history the likelihood of rendering a particular Defendant competent to stand trial.  Based on the evidence before It, including the prior improvements in mental health the Defendant enjoyed when medicated and the recommendations of the Defendant's current medical team, the Court finds that with proper antipsychotic medication the Defendant would most likely

be rendered competent to stand trial.

      B.    <u>Will the Medication Significantly Interfere with the Defendant's Ability to Assist at Trial</u>

      Many antipsychotic medications present mild to significant physical side effects that range from headache to death.  The medical team for the Defendant recited at length the many antipsychotic drugs available to the Defendant, and their associated physical risks.  (*See* Forensic Evaluation, Federal Medical Center Butner, pp. 8-14).  The Court will not recount all of the options available to the Defendant, but will note that the recommended medication for the Defendant by the medical team is either Prolixin decanoate or Haldol decanoate.  (*Id*. at 11).

      The side effects for Prolixin and Haldol are the same and include movement disorders of Parkinsonian effects, dystonic reactions, akathisia, and tardive dyskinesia.  (*Id*.).  Other than tardive dyskinesia, each of these effects are reversible with the discontinuation of the medication. (*Id*.).  Additional medications exist to counteract most of the side effects, but carry with them side effects of their own, most of which are mild in nature.  (*Id*.).

      Despite the many side effects the Defendant could possibly incur if given the recommended medication, the medical team currently assisting the Defendant feels that "it is substantially unlikely that any side effects would interfere with his ability to cooperate with counsel in his defense."  (*Id*. at 10).  This Court agrees with the Supreme Court that "[n]otwithstanding the risks that are involved .... an inmate's interests are adequately protected and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge."  (*Washington v. Harper*, 494 U.S. 210, 1042 (1998)).  This Court is in no position to refute the medical teams findings, and so holds that the effects of the

proposed medications would not interfere with the Defendant's ability to assist in trial.  The

Government has therefore provided clear and convincing evidence and has satisfied the second

prong of the *Sell* criteria.

      III.    <u>Are Less Intrusive Means Available</u>

      This prong of the *Sell* criteria is relatively straight forward and has previously been

addressed.  The medical team for the Defendant indicated that Mr. Schloming has participated in

therapy, individual and group.  (Testimony of Dr. Grant, April 11, 2006 *Sell* Hearing).  The

medical team further asserts that therapy alone will not render the Defendant competent, nor

would it fully assist any patient with a similar diagnosis.  (*Id*.).  The medical team finds that no

other treatment is available to the Defendant.  (*Id*.).  Without the medication, the Defendant will

continue to worsen.  He will become less responsive and cooperative until he achieves the full

effects of the illness.  He will remain unable to understand the nature of the charges against him,

or assist counsel in his own defense at trial.  He does not believe that he is mentally ill and as a

result, will not consent to the administering of antipsychotic drugs.

      As such, the Government clearly and convincingly satisfies this prong of the *Sell* analysis

as no less intrusive means exist to render the Defendant competent to stand trial.

      IV.    <u>Is the Administration of Antipsychotic Medication in the Defendant's Best
Interest in Light of his Medical Condition</u>

      The question of whether involuntarily medicating an individual is in his best interest is

more complicated than it appears at first blush.  Objectively, the Defendant would undoubtedly

benefit from the administering of antipsychotic medication.  Based upon the limited amount of

medication the Defendant has been sporadically willing to take, his hygiene has improved, his

patience has grown, and his understanding of his general circumstances has increased.  (*Id*.).  As previously discussed, consensus regarding his medical affliction as well as what is necessary to lessen that affliction has been reached.  Objectively, the administration of antipsychotic medication is in the Defendant's best interest in light of his medical condition.

Subjectively, the answer is obfuscated by the Defendant's own wishes.  Lucas Schloming does not want to be medicated.  Whether he doesn't believe that he has a mental illness requiring treatment, or whether, as an extremely bright and highly educated man, he is simply exercising his right not to be medicated is of little moment.  He does not want the recommended medication.  As sincerely as he does not wish to be medicated is how sincerely his medical team wishes he would consent.  The team has recommended, both in their written medical evaluation as well as during their testimony, that this Court forcibly medicate the Defendant.  There is evidence that his family has encouraged him to take the recommended medication as well.  Yet he resists.

The question of whether the medication of an individual who does not wish to be medicated is a tortured one.  This Court has laid witness to the ravages of the Defendant's diseased mind.  It is saddening to know what he was, what he has become, and what he could be if he agreed to take the medication prescribed.  It is, however, equally saddening to envision him being forcibly medicated and potentially suffer significant side effects from said medication, medication he did not want nor voluntarily ingested.  Therein lies the conundrum.  If the Defendant were not mentally ill, would he agree to take the medication?  If he is not medicated, how will we know?

In the end this Court must find that the Government has provided enough evidence to

*objectively* meet this final prong of the *Sell* criteria.  Subjectively, the answer remains hidden within the confines of the Defendant's mind.

**Conclusion**

ACCORDINGLY, IT IS on this 12th day of May, 2006

ORDERED that the Government's Motion to Involuntarily Medicate Defendant Lucas Schloming for purposes of rendering him competent to stand trial is DENIED.

s/Tonianne J. Bongiovanni
**HONORABLE TONIANNE J. BONGIOVANNI
UNITED STATES MAGISTRATE JUDGE**